COMMONWEALTH *vs.* WILLIAM E. DINKINS.

Suffolk. March 2, 1993. - July 8, 1993.

Present: LIACOS. C.J.. NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ

*Homicide. Joint Enterprise. Identification. Practice, Criminal,* Instructions to jury, Argument by prosecutor. *Evidence,* Joint enterprise, Identification, Cross-examination, Relevancy and materiality.

Evidence at a criminal trial was sufficient to warrant the jury's verdicts of guilty on indictments for first degree murder on a joint venture theory, unlawful carrying of a firearm, and assault with intent to kill a second victim. [717-719]

A photographic identification procedure in which a witness first viewed approximately 200 photographs and tentatively identified the defendant, and during the next two days viewed two arrays of 10 and 29 photographs, neither of which contained the defendant's photograph and then, about a month later, viewed an array of nine photographs from which he positively identified the defendant as the perpetrator, was not unnecessarily suggestive and conducive to mistaken identification, and the judge correctly denied the defendant's motion to suppress that identification and subsequent in-court and out-of-court identifications. [720-721]

No substantial likelihood of a miscarriage of justice was created at a murder trial by the admission in evidence of out-of-court and in-court identifications of the defendant based on a witness's observation of the defendant on the night the crime was committed and on previous occasions. [721-722]

In the circumstances of a murder trial, no substantial likelihood of a miscarriage of justice was occasioned by the admission, without limitation, of a police officer's testimony that a witness had made a tentative identification of the defendant from a photographic array, which the witness denied making. [722-723]

There was no merit to a criminal defendant's contention that a jury instruction drawn verbatim from *Commonwealth* v. *Webster,* 5 Cush. 295, 320 (1850), on the Commonwealth's burden to prove its case beyond a reasonable doubt, shifted or reduced that burden. [723-724]

At a criminal trial there was no error in the judge's limiting the defendant's cross-examination of a witness to relevant matters. [724]

The prosecutor's closing argument at a murder trial was based on the evidence presented and did not imply that the prosecutor knew more about the case than he had presented in court. [724-725]

This court declined, in the circumstances, to exercise its power under G. L. c. 278, § 33E, to order a new trial or reduce a verdict of first degree murder to a lesser degree of guilt. [725-726]

INDICTMENTS found and returned in the Superior Court Department on April 11, 1990.

A pretrial motion to suppress evidence was heard by *Daniel A. Ford,* J., and the cases were tried before *John A. Tierney,* J.

*John R. Campbell* for the defendant.

*Paul B. Linn,* Assistant District Attorney (*Daniel C. Mullane,* Assistant District Attorney, with him) for the Commonwealth.

O'CONNOR, J. After a jury trial, the defendant was convicted of the murder in the first degree of Junior R. Fernandez, assault with the intent to kill Francisco Rodriguez, and unlawfully carrying a firearm. The defendant appeals from these convictions, claiming error in: (1) the denial of his motion for a required finding of not guilty of each crime charged; (2) the denial of his motion to suppress the out-of-court and in-court identification of him by two witnesses; (3) the admission of a detective's testimony concerning an out-of-court photographic identification of the defendant by Francisco Rodriguez; (4) the judge's instructions to the jury concerning the burden of proof; and (5) the restriction of the defendant's cross-examination of a Commonwealth witness. The defendant also argues (6) that the defendant was denied a fair trial by the prosecutor's argument to the jury based on facts not in evidence. Lastly, the defendant requests that, in the event we reject his claims of error regarding the murder conviction, we exercise our power under G. L. c. 278, § 33E (1990 ed.), to order a new trial or reduce the verdict to a lesser degree of guilt.

We summarize the evidence in the light most favorable to the Commonwealth. *Commonwealth* v. *Cordle,* 404 Mass.

733, 734 (1989). Francisco Fernandez, Junior Fernandez's father, arrived at the Fernandez market at about 10 P.M., February 17, 1990, to help close the market for the night. He noticed two young men sitting on the steps of the house next to the market. He recognized one of them, the defendant, as a frequent customer of the market. At about 10:30 P.M., Junior Fernandez's uncle, Francisco Rodriguez (Rodriguez) left the market and crossed the street to his Thunderbird automobile. He noticed two young men on the porch of the house next to the market. One of them was the defendant, whom he had seen in the market several times. A few minutes later, while Rodriguez was still in his vehicle, Junior Fernandez left the market and crossed the street to another automobile, a Datsun which his brother, William Fernandez, owned. The Datsun was parked directly behind the Thunderbird. When Junior Fernandez started the Datsun, the defendant and his companion walked across the street, the defendant going in front of the Thunderbird and his companion going behind the Datsun. The defendant propped himself up on the front bumper of the Thunderbird and pointed a gun at Rodriguez, who quickly laid down on the front seat. Rodriguez heard three shots and his windshield was shattered. Rodriguez crawled from his vehicle toward the market, still hearing gunshots behind him. When the gunshots had stopped, Rodriguez went to the Datsun and found Junior Fernandez bleeding from a bullet wound in his head. Junior Fernandez died soon afterwards.

Shortly before the killing, William Fernandez, Junior Fernandez's brother and the owner of the vehicle in which Junior Fernandez was killed, had been summoned to testify at the trial of a person who had been accused of shooting another man in front of the Fernandez market in March, 1989. That trial was scheduled for late February, 1990, just a few days after the shooting of Junior Fernandez. William Fernandez intended to identify the assailant in that case.

There is no contention that the defendant lawfully carried a firearm. The defendant's principal position as to that charge and the charge of assault with intent to kill Rodri-

guez is simply that he was misidentified. It is clear that a finding was warranted that the defendant unlawfully carried a firearm and used it to assault Rodriguez with intent to kill him. On the murder indictment, the Commonwealth proceeded on the theory that the defendant had participated in a joint venture with his companion to murder Junior Fernandez. The Commonwealth's proof was sufficient to warrant the jury's verdict in that regard. The evidence set forth above disclosed that the defendant and his companion were together for at least thirty minutes facing the victims' automobiles, that, when Junior Fernandez emerged from the market and went to his vehicle, the defendant and his companion simultaneously walked across the street to the vehicles, and that the defendant had a gun. The jury reasonably could have inferred that the companion also had a gun that he used to shoot Junior Fernandez and that the two simultaneous shootings were not mere coincidence but, instead, were concerted actions designed by the two men to result in the deaths of the two victims.

The critical question with respect to whether the evidence set forth above was sufficient to warrant a finding of the defendant's guilt, as a joint venturer, of murder of Junior Fernandez in the first degree, "is whether the evidence . . . was sufficient to warrant findings that the defendant was present at the scene of the attack on [Junior Fernandez], that he knew of [the assailant's] criminal intentions, and that by agreement he was willing and available to help [the assailant] if necessary. . . . For joint venturer criminal liability, the defendant's knowledge requirement is satisfied by his or her knowledge that there is a substantial likelihood that the crime will be committed by the other person." (Citations omitted.) *Commonwealth* v. *Walsh*, 407 Mass. 740, 743 (1990). The evidence was sufficient to show that the defendant was present at the scene of the attack on Junior Fernandez, and that that attack and the defendant's attack on Rodriguez were mutually contrived by the defendant and his companion as a joint endeavor to kill the two victims. The judge did not err in denying the defendant's motion for a

required finding of not guilty of any of the charges set forth in the three indictments.

Before the trial, the defendant moved to suppress all out-of-court and in-court identifications of the defendant, claiming that the out-of-court identifications were made under circumstances that were unnecessarily suggestive and conducive to irreparable mistake, and that the in-court identifications had no independent source. After an evidentiary hearing, a judge denied the motion — erroneously, the defendant says. The evidence specifically sought to be suppressed consisted of out-of-court and in-court identifications by Rodriguez and Francisco Fernandez. We recite the material findings of the motion judge which, although challenged in part by the defendant, we are satisfied are supported by the evidence presented at the hearing. The motion judge found in material part as follows: Detective William C. Dwyer of the Boston police department's homicide unit went to the scene of the shooting on the night it occurred, February 17, 1990. "He brought Rodriguez to the area police installation and showed him a book consisting of approximately 200 photographs of black males under 20 years of age. The photographs [were] arranged four to each side of a page, so that eight photographs may be observed when the book [was] open and two pages [were] displayed. Detective Dwyer never told Rodriguez which photographs to select and did not call his attention to any particular photograph(s). He merely asked Rodriguez to go through the book carefully to see if he could find a photograph of the shooter or of the man who crossed the street with the shooter. . . . Rodriguez had just experienced the murder of his nephew, and had himself been the victim of an assault with a dangerous weapon. Consequently, he was extremely upset, nervous and fearful at the time. . . . When Rodriguez came to the defendant's photograph, he became even more visibly shaken. He told Detective Dwyer that the shooter 'looks like this guy here,' referring to the defendant's photograph, but said he could not be sure. . . . Detective Dwyer had information that members of the so-called Kings Gang were known to hang around Fernandez Market, and

there was a high degree of gang activity in Dorchester at the time. Accordingly, because he did not have a positive identification of the first suspect and there was a second suspect who was unidentified, he then showed Rodriguez 10 photographs of persons believed to be members of the Kings Gang. All 10 were young black males. At that time, the defendant was not known as a possible member of that gang, and therefore his picture was not included in the group of 10. Rodriguez did not select any photographs from that array. . . . Thereafter, Detective Dwyer received information that there was some relationship or interaction between the Kings Gang and another known gang. Accordingly, Detective Dwyer put together an array of 29 photographs of persons believed to be members of that second gang. All 29 were young black males. Once again, the defendant's picture was not in that array. Those 29 photographs were shown to Rodriguez on February 19, 1990, and he did not select any of them. . . . Approximately one month later Rodriguez called Detective Dwyer and asked him if he could look at the photographs again. Detective Dwyer assembled an array of nine photographs of young black males. The defendant's photograph (which was another print of the same photograph which Rodriguez had tentatively identified previously) was included. Also included was one photograph from the 29-picture array which Rodriguez viewed on February 19. . . . Rodriguez came into the police station on March 21, 1990, and viewed the array of 9 photographs. Detective Dwyer did absolutely nothing to suggest that Rodriguez should select any particular photograph. After perusing the group of pictures, Rodriguez selected the photograph of the defendant as being the shooter and stated that he was sure."

The defendant argues that Rodriguez's photographic identification of him on March 21, 1990, was unnecessarily suggestive and conducive to mistaken identification and that, therefore, that identification as well as Rodriguez's in-court identification of the defendant should have been suppressed. We do not agree. We agree, of course, that if the photographic identification procedure was unnecessarily suggestive

and conducive to misidentification, suppression of the identification and any in-court identification tainted by it would have been required. *Commonwealth* v. *Smith*, 414 Mass. 437, 442-443 (1993). We hold, however, that Rodriguez's photographic identification of the defendant on March 21, 1990, was not unnecessarily suggestive and conducive to misidentification and therefore the judge was correct in not suppressing Rodriguez's out-of-court or in-court identification of the defendant. We reject the defendant's argument, as we have rejected similar arguments in other cases, that the inclusion of the defendant's photograph in the March 21 array after the same photograph (different print) had been included in the first, two hundred photograph, array, requires suppression. See *Commonwealth* v. *Paszko*, 391 Mass. 164, 169-171 (1984), and cases collected there. We agree with the motion judge that "[b]ecause Rodriguez had tentatively identified a picture of the defendant on a prior occasion, it was reasonable for the police to include the defendant's picture [as well as a picture of another individual that had been included in an earlier array] in that array."

The defendant also argues, for the first time on appeal, that an out-of-court photographic identification of the defendant, as well as an in-court identification, by Francisco Fernandez, should have been suppressed. That contention was not made in the Superior Court in the defendant's memorandum in support of his motion to suppress or at the motion hearing and was not addressed by the motion judge. At the trial, the defendant did not argue that Fernandez's out-of-court or in-court identification of the defendant was inadmissible. Therefore, at least as to the murder indictment,[1] we review the admission in evidence of that testimony under G. L. c. 278, § 33E, only to determine whether it created a substantial likelihood of a miscarriage of justice. *Common-*

---

[1]As to the other indictments, we limit our review to the question whether admission of the testimony created a substantial risk of a miscarriage of justice. *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967).

*wealth* v. *Stewart*, 398 Mass. 535, 543-544 (1986). *Commonwealth* v. *Palmariello*, 392 Mass. 126, 145 (1984).

There was evidence at trial that Francisco Fernandez was at the police station on March 21, 1990, when Rodriguez identified the defendant's photograph. After Rodriguez selected the photograph, Francisco Fernandez asked to see it. Upon being shown the photograph, Fernandez stated that the person in the photograph was the person that Rodriguez had attempted to describe to the police on the night of the shooting. Fernandez testified at the trial that, when he saw the defendant's photograph, he knew that that was the person that Rodriguez had attempted to describe on the night of the shooting and that the defendant was one of the persons Fernandez had seen on the porch before the shooting. In *Commonwealth* v. *Moynihan*, 376 Mass. 468, 474-477 (1978), we upheld a photographic identification in similar circumstances. In any event, the evidence suggests that Francisco Fernandez's out-of-court and in-court identification of the defendant was based on Fernandez's observation of the defendant on the night of the shooting and recognition of him as a frequent customer of the market. No substantial likelihood (or risk) of a miscarriage of justice has been established.

We turn now to the defendant's argument that the trial judge erred by admitting Detective Dwyer's testimony that, on February 18, 1990, while viewing the array of two hundred photographs, Rodriguez "stopped and he began shaking and with a finger on [the defendant's] photo . . . he said to me, it looks like him. I then asked him if it was him and he said, 'I'm not sure,' and he stopped there. He wouldn't identify him." Although this testimony was consistent with Dwyer's and Rodriguez's earlier testimony at the suppression hearing, it was not consistent with Rodriguez's trial testimony. At the trial, Rodriguez testified differently from what he had said at the suppression hearing, that "that very night they showed me many photographs but I can't say anything because I was too nervous and I couldn't talk." When asked if he had picked out a photograph, he replied, "Not that very

day but afterwards, when my nerves became calmer, I went back and I looked among them and then I recognized." Thus, at the trial, Rodriguez denied that he had identified the defendant's photograph when he was first shown an array. We held in *Commonwealth* v. *Daye*, 393 Mass. 55, 61 (1984), that "a police officer's attribution to a witness of a positive identification denied by the witness at trial is not admissible to prove the identification. Its effect is limited to impeachment." Detective Dwyer's testimony was admitted without limitation and without objection. Because there was no objection, our review of this issue, with respect to the murder indictment, is limited to the question whether admission of the testimony without limitation creates a substantial likelihood of a miscarriage of justice.[2] We are satisfied that admission of Dwyer's testimony did not create a substantial likelihood (or risk) of a miscarriage of justice. The jury heard Rodriguez's testimony that one month after the shooting he selected the defendant's photograph from the March 21 array and positively identified him as the shooter. He also testified that he recognized the defendant because he had been a customer at the market. There is no substantial likelihood or risk that the jury was influenced to find the defendant guilty of any of the charges against him by the testimony of Dwyer concerning Rodriguez's February 18 selection of the defendant's photograph.

Next, the defendant argues that the judge's instruction to the jury concerning the Commonwealth's burden to prove its case beyond a reasonable doubt was defective. Specifically, the defendant argues that the judge's instruction that reasonable doubt "is that state of the case which after the entire comparison and consideration of all the evidence leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge" was wrong because it "shift[ed] the burden of proof and reduc[ed] the burden of proof required of the Commonwealth." "The jury should not have to *compare*

---

[2]As to the other indictments, see note 1, *supra*.

the evidence since the only *comparison* can be with that of the defense and the defendant has the right to force the Commonwealth to the proof" (emphasis in original), argues the defendant. The defendant's argument is without merit. Almost all of the jury instruction concerning the Commonwealth's burden of proof beyond a reasonable doubt, including the statement set forth above, was a direct quote from *Commonwealth v. Webster*, 5 Cush. 295, 320 (1850). We have repeatedly said that a judge's explanation of reasonable doubt "is usually best made in close reliance on the time-tested language of [*Webster*]." *Commonwealth v. Gerald*, 356 Mass. 386, 390 (1969). *Commonwealth v. Beldotti*, 409 Mass. 553, 562 (1991). *Commonwealth v. Wood*, 380 Mass. 545, 551 (1980). The judge instructed the jury that "[t]he burden of proof is on the prosecutor," that "every person is presumed to be innocent until proven guilty," that "the indictments in the case, the three indictments are not evidence," and that "it is not sufficient to establish a probability, though a strong one, . . . that the fact charged is more likely to be true than the contrary." The jury instruction did not shift or reduce the burden of proof in this case.

The defendant also argues that the trial judge erred by limiting the defendant's cross-examination of a detective who arrested the defendant at a trailer park in North Carolina. Defense counsel sought to inquire of the detective as to the number of times the detective had visited the trailer park prior to the date of the defendant's arrest. The prosecutor objected to the question on relevancy grounds, and the objection was sustained. There was no error.

We come to the defendant's contention that the judge erred by denying his motion for a mistrial when the prosecutor allegedly argued facts of which there was no evidence. The arguments that the defendant asserts had no evidentiary support were that the defendant and his accomplice were waiting to "stalk, perhaps not Junior [Fernandez], perhaps William, but waiting." The defendant argues that the jury was asked to speculate that William Fernandez was the per-

son to be shot and that they could have inferred that the prosecutor had more evidence than he had presented.

"[P]rosecutors are entitled to marshal the evidence and suggest inferences that the jury may draw from it." *Commonwealth* v. *Drayton*, 386 Mass. 39, 52 (1982). The inferences suggested by the prosecutor need only be reasonable and possible and need not be necessary or inescapable. See *Commonwealth* v. *Stewart*, 411 Mass. 345, 350 (1991). The prosecutor's argument that the defendant and his companion might have mistaken Junior Fernandez for his brother, William, was supported by the evidence introduced at trial. William testified that he owned the Datsun in which Junior Fernandez had been killed and that he had been summoned to testify in a trial scheduled for later in the month in which his brother was killed. At that trial, William Fernandez was going to testify that the defendant in that case had shot a person in front of the Fernandez market in 1989. Furthermore, a photograph was introduced in evidence showing William Fernandez and Junior Fernandez, from which the jury could have concluded that they bore a close resemblance to each other. Rodriguez testified that the defendant and his companion stayed on the porch across the street until the moment that Junior Fernandez appeared. Based on this evidence, the prosecutor was entitled to suggest in his closing argument that William Fernandez might have been the intended victim. In addition, the argument did not imply that the prosecutor knew more about the case than he had presented in court. There was no error.

We have reviewed the murder conviction pursuant to G. L. c. 278, § 33E, and we are not persuaded that we should exercise our extraordinary power to order a new trial or reduce the verdict to a lesser degree of guilt. This case is not like others, in which we have exercised our powers, involving non-lethal confrontations that have senselessly and quickly escalated into killings, *Commonwealth* v. *Maskell*, 403 Mass. 111, 117 (1988) (minor altercation over a dog escalated rapidly into shooting match); *Commonwealth* v. *Tavares*, 385 Mass. 140, 157-159 (fight was not planned en-

counter but spontaneous reaction to alleged insults by the victim toward the defendant and others), cert. denied, 457 U.S. 1137 (1982); *Commonwealth* v. *King*, 374 Mass. 501, 506-508 (1978) (trivial argument escalated into deadly brawl where the knife used was present fortuitously); *Commonwealth* v. *Seit*, 373 Mass. 83, 94-95 (1977) (defendant and victim were long-time friends); *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 749-750 (1975) (defendant approached victim to settle a conflict peacefully); *Commonwealth* v. *Jones*, 366 Mass. 805, 807 (1975) (altercation was initiated by nonsensical argument earlier in the day). In this case, the jury could have found beyond a reasonable doubt that the defendant and his companion waited for the victims to go to their automobiles, walked across the street, and opened fire on the victims at close range. There is nothing to suggest that this was a minor confrontation that by chance escalated to a lethal one.

*Judgments affirmed.*