## COMMONWEALTH *vs.* SCOTT TEVLIN.

Plymouth. November 9, 2000. - January 30, 2001.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, & SOSMAN, JJ.

*Robbery. Assault and Battery by Means of a Dangerous Weapon. Dangerous Weapon. Practice, Criminal,* Instructions to jury, Assistance of counsel, Agreement between prosecutor and witness, Capital case. *Felony-Murder Rule. Proximate Cause. Constitutional Law,* Assistance of counsel. *Evidence,* Hearsay, Spontaneous utterance.

At the trial of an indictment for armed robbery, evidence that the defendant used his sneakered foot to stomp the elderly victim lying on the ground warranted a conclusion that the sneaker was a dangerous weapon capable of producing serious bodily harm. [310-313]

A conviction of the felony of armed robbery, in which the dangerous weapon was the defendant's sneakered foot applied to the elderly victim's stomach as she lay on the ground, was sufficient to support a conviction of felony-murder upon the death of the victim. [313-314]

The intent to commit a felony, armed robbery, served as the malice necessary for conviction of felony-murder, and it was immaterial that the use of a shod foot in the robbery was the same act that caused the victim's death. [314-315]

At the trial of a murder case on the theory of felony-murder, the judge clearly instructed the jury that the victim's death must have occurred as a direct result of the defendant's acts, and no substantial likelihood of a miscarriage of justice was created by the judge's failure to include the specific phrase "natural and probable consequence." [315-316]

The record of a murder trial did not support the defendant's claim that his counsel's waiver of a motion to suppress a witness's out-of-court identification of the defendant, a decision in which the defendant fully participated, constituted ineffective assistance of counsel, where there appeared to be a sound tactical basis for the decision and where the Commonwealth's case would not have been weakened even if the identification had been suppressed. [316-318]

At a murder trial, there was no error in the judge's admission in evidence, as a spontaneous exclamation, the victim's statement to a doctor at a hospital about one-half hour after the incident. [318-319]

A statement made by a defendant charged with murder to a fellow inmate, while they awaited their respective trials, that demonstrated the defendant's consciousness of guilt, was properly admitted in evidence at the murder trial, and the inmate was not shown to have been a government agent; no substantial likelihood of a miscarriage of justice was shown. [319-321]

INDICTMENTS found and returned in the Superior Court Department on March 25, 1996.

The cases were tried before *Wendie I. Gershengorn*, J.

*Michael J. Traft* for the defendant.

*Robert C. Thompson*, Assistant District Attorney, for the Commonwealth.

COWIN, J. A Superior Court jury found the defendant guilty of three offenses: murder in the first degree based on felony-murder, armed robbery, and assault and battery by means of a dangerous weapon. On appeal, the defendant asserts the following: (1) the trial judge erred in denying his motion for a required finding of not guilty on the charge of armed robbery, because, in the circumstances of this case, as a matter of law, the use of a sneaker in the perpetration of a robbery cannot constitute the use of a dangerous weapon for purposes of armed robbery; (2) the judge erred by denying his motion for a required finding of not guilty on the charge of felony-murder with armed robbery as the underlying felony because the act that is the basis of the dangerous weapon element of armed robbery, the use of a shod foot, is the same act that caused the death; (3) the judge erred in her instructions on felony-murder by failing to include an instruction that death had to be the natural and probable consequence of the felony and by permitting the jury to infer that the circumstances involved in this case were inherently dangerous; (4) the defendant was deprived of the effective assistance of trial counsel because his counsel waived a motion to suppress an out-of-court identification of the defendant; (5) the judge erred in allowing in evidence as an excited utterance a statement made by the victim at the hospital more than one-half hour after the incident and after she had spoken with the police and medical personnel; (6) the judge erred in admitting statements of the defendant made to an informant inmate; and (7) a retrial on any homicide charge would violate the defendant's constitutional right to be free from double jeopardy. He also asks us to invoke our extraordinary power pursuant to G. L. c. 278, § 33E, to order a new trial, or to direct entry of a verdict of a lesser degree of guilt as to the murder verdict. We affirm the convictions and decline to exercise our power under G. L. c. 278, § 33E, to order a new trial, or to reduce the murder conviction to a lesser degree of guilt.

The following is a recitation of the evidence in the light most favorable to the Commonwealth. *Commonwealth* v. *Latimore*,

378 Mass. 671, 676-677 (1979). As we consider certain issues raised by the defendant, we shall recite such additional facts as are pertinent to those issues. On March 2, 1996, just before 7:30 A.M., the defendant assaulted seventy-four year old Angela Lyons in the parking lot of a Shaw's supermarket in Brockton, attempting to steal her purse. Lyons resisted, and the defendant tugged on her purse straps, knocking her down and dragging her across the pavement. He then stomped on her stomach. Once he wrenched the purse loose, he fled the scene in a white car.

Cecelia Peterson, an eyewitness, assisted Lyons following the attack. Lyons told Peterson that the assailant had stomped on her stomach. Lyons was upset and experiencing pain when she said this; she was also losing sensation in her legs.

Shortly thereafter, Officer Steven Williamson of the Brockton police department arrived. Lyons told him that a young white male had attacked her. Peterson described the assailant to Officer Williamson as approximately twenty years old, five feet ten inches tall, and 150 pounds. According to her, he had black hair, a mustache, and a goatee.[1] Peterson saw the assailant drive off in a white car with a registration plate that she remembered as 214 ZPF.[2]

Officer Williamson requested an ambulance, and Lyons reluctantly agreed to go to the hospital. At the hospital, Lyons appeared anxious and in pain. About one-half hour after the incident she explained to Dr. John Steinmetz that a young man had attacked her, trying to steal her purse, and stomped twice on her stomach. Lyons's aorta was crushed, just above her navel, and the aorta remained crushed because it was calcified with cholesterol plaque. This impaired the blood flow to her spinal cord and lower extremities. Her condition deteriorated, and gangrene began spreading in both her legs. Despite surgery to repair her damaged aorta, she died three days later. The cause of death was complications due to blunt abdominal trauma.

Four days after the attack, police found a white Pontiac Bonneville automobile parked outside an apartment complex in

---

[1] The booking information concerning the defendant's arrest indicates that the defendant was five feet eleven inches tall and weighed 170 pounds. A photograph taken on the day of his arrest shows that the defendant also had dark hair, a mustache, and a goatee.

[2] Another witness also saw the defendant drive off in a white car. She remembered that the registration plate began with the numbers 214.

Brockton. It had been stolen from the owner's home in Fall River some time between 8:30 P.M., March 1, 1996, and 8:30 A.M., March 2, 1996. A fingerprint on the wiper control lever matched the defendant's left thumb print. Peterson later identified a photograph of the Pontiac Bonneville, with registration plate 214 ZPV, as the car in which she had seen the assailant.

Peterson worked with State Trooper Scott Berna to prepare a composite sketch of the assailant on March 4, 1996, and a second sketch four days later. She met with Trooper Berna on March 5, 1996, to review an array of photographs. Peterson identified hair in one of the photographs as being similar to the assailant's hair. The defendant's photograph was not among those shown to Peterson.

On March 10, 1996, Trooper Berna showed Peterson a series of eighteen photographs. Included was a photograph of the defendant from three years earlier. Peterson did not make an identification. The next day, Peterson reviewed eight more photographs, one of which was a photograph of the defendant taken that morning. Peterson could not positively identify the assailant, but she believed that he resembled number six and number eight. The defendant's photograph was number seven.

On March 12, 1996, Peterson saw a picture of the defendant in a newspaper that reported that he was the man arrested for the attack on Lyons. Peterson telephoned Trooper Berna. She was concerned that the police may have arrested the wrong man because she did not recognize the defendant's picture as the man she remembered as the assailant. The picture, however, was blurred and showed the defendant's profile.

Peterson met with Trooper Berna on March 13, 1996. She asked him if he had any pictures of the defendant, and he showed her about one dozen photographs of him. She did not make, nor was she asked to make, an identification of the assailant that day. The two discussed the case and Trooper Berna told Peterson that police had found the defendant's fingerprint in the Pontiac Bonneville.

On March 15, 1996, Peterson called Trooper Berna and told him that she was confident that the defendant was in fact the assailant. Peterson explained that when she saw the assailant's face on the day of the attack, he was grinning. She said that initially she looked for that same expression in the pictures Trooper Berna showed her. Once she removed that grin from

her mind, she realized that the defendant was the assailant. She also identified the defendant at trial as the man she saw attack Lyons.

At the time of the attack, the defendant was living with his girl friend at an apartment complex in Fall River, approximately a five-minute walk from where the Pontiac Bonneville had been stolen. About 6 A.M. on March 2, 1996, the defendant stopped by the Brockton home of John Reggiani, described as the defendant's "surrogate" stepfather. (He had lived with the defendant's mother when the defendant was a child.) While there, the defendant smoked a piece of crack cocaine. He stayed for about forty-five minutes and, before leaving, mentioned that he wanted to get more crack cocaine.

The defendant returned to Reggiani's home at about 8 A.M. He told Dorothea Hustus, who lived with Reggiani, that he and a friend were involved in robberies at Shaw's supermarkets in Easton and Abington. He also said that he had stolen a car that was "real hot." On hearing this, Hustus asked the defendant to leave, but he wanted to wait a few minutes until things "calmed down." He then counted his money; he had seventeen dollars, and he asked to borrow three more from Hustus. A piece of crack cocaine costs twenty dollars. The defendant was acting nervous and repeatedly looked out the windows. The defendant had been to Hustus's home many times before and generally arrived in a stolen car. However, he did not usually appear so nervous. Before leaving, he asked Hustus to check outside for police, which she did. He then walked over to a white car parked down the street, paced back and forth for about twenty minutes while he looked around the area, and finally got into the car and drove off.

The defendant returned to Hustus's home in the white car about twenty minutes later. He told Hustus that he had gotten into an accident and needed a place to stay because the police might be looking for him. He stayed with Hustus until about 10 A.M. The following week, Hustus was taken to the Brockton police department and recognized a white car in the police garage as the car the defendant drove to her house on March 2, 1996. She identified a photograph of the Pontiac Bonneville as the car she saw at the police station.

The defendant was arrested on March 11, 1996. When he was arrested, he told the police that he probably had been at his girl friend's house in Fall River on the night of March 1, 1996. He

also said that he had gotten the sneakers he was wearing within the last week from someone he met on the street. His girl friend testified that the defendant had received the sneakers from his sister in January, 1996. After his arrest, while incarcerated at the Plymouth County house of correction, the defendant admitted his involvement in the crime to an inmate, Michael Dubis.

1. *Sneakers as dangerous weapon.* The defendant claims that the judge erred in denying his motion for a required finding of not guilty on the charge of armed robbery, because, as a matter of law, in the circumstances of this case, the use of a sneaker in the perpetration of a robbery cannot constitute the use of a dangerous weapon for purposes of armed robbery. We reject the defendant's claim that there was insufficient evidence to establish that his sneakers had been employed as a dangerous weapon.

Armed robbery is an aggravated form of robbery and requires that the defendant be armed with a dangerous weapon. *Commonwealth* v. *Howard*, 386 Mass. 607, 611 (1982). Our statutes do not define the term "dangerous weapon," but we have consistently said that there are things that are dangerous per se and those that are dangerous as used. *Commonwealth* v. *Appleby*, 380 Mass. 296, 303 (1980), citing *Commonwealth* v. *Farrell*, 322 Mass. 606, 615 (1948). See *Commonwealth* v. *Wolinski*, 431 Mass. 228, 236 & n.13 (2000). In the former class are those "instrumentalit[ies] designed and constructed to produce death or great bodily harm." *Commonwealth* v. *Appleby, supra.* The latter class consists of those things that become dangerous weapons because they are "used in a dangerous fashion." *Id.* at 304. "The essential question, when an object which is not dangerous per se [such as sneakers] is alleged to be a dangerous weapon . . . [is] 'whether the object, as used by the defendant, is capable of producing serious bodily harm.' " *Commonwealth* v. *Mercado*, 24 Mass. App. Ct. 391, 397 (1987), quoting *Commonwealth* v. *Marrero*, 19 Mass. App. Ct. 921, 922 (1984). Accord *Commonwealth* v. *Sexton*, 425 Mass. 146, 149 (1997), and cases cited. "Resolution of these questions is invariably for the fact finder . . . and involves not only consideration of any evidence as to the nature and specific features of the object but also attention to the circumstances surrounding the assault and the use of the object, and the manner in which it was handled or controlled" (citations omitted). *Commonwealth* v. *Marrero, supra.*

"Footwear, such as a shoe, when used to kick, can be a dangerous weapon." *Id.* Here, there was evidence that the defendant, approximately twenty years old, five feet eleven inches and weighing 170 pounds, "stomped real hard" once or twice on the stomach area of a seventy-four year old woman who lay beneath him on a cement pavement. The circumstances of this assault and the use of the sneakers permitted the jury to determine that the sneakers, as used, were capable of producing serious bodily harm. The logic of this proposition is clearer when stated in the negative: it could not be said, as matter of law, that sneakers used in these circumstances could not be capable of producing serious bodily harm. Accord *Commonwealth v. Fernandez*, 43 Mass. App. Ct. 313, 314-316 (1997) (evidence that defendant wildly and continuously kicked two officers many times and administered at least one kick to one officer's groin area was sufficient to prove that defendant employed sneakers as dangerous weapon, even in absence of any evidence as to manner in which defendant kicked the officers or any indication of degree of force used or injuries inflicted); *Commonwealth v. Polydores*, 24 Mass. App. Ct. 923, 924-925 (1987) (evidence that defendant's feet "were shod with running shoes," that he kicked victim repeatedly, and that she sustained black eyes, bruises, and a fractured nose sufficient to raise question of fact whether defendant employed a dangerous weapon). See also *Commonwealth v. Marrero, supra* at 923-924.

We have also said that, in a robbery, "whether the weapon is actually used to inflict harm is largely irrelevant. Rather . . . the relevant point is the 'objectively menacing conduct of the defendant . . . [producing] the fear of harm which it was intended to produce . . . .' " *Commonwealth v. Tarrant*, 367 Mass. 411, 415 (1975), quoting *Commonwealth v. Slaney*, 345 Mass. 135, 140 (1962). "[T]he proper inquiry is whether the instrumentality is such as to present an objective threat of danger to a person of reasonable and average sensibility." *Commonwealth v. Tarrant, supra* at 416. In sum, the issue, where a neutral object is involved, turns on whether the instrumentality under the control of the perpetrator has the apparent ability to inflict harm, whether the victim reasonably so perceived it, and whether the perpetrator by use of the instrumentality intended to elicit fear in order to further the robbery. Here, the defendant's sneakers, when used to stomp on the victim's stomach, had the apparent ability to inflict harm; they were

undoubtedly perceived as such by an elderly woman lying on the ground, and the evidence warrants the conclusion that the defendant was using his sneakers to elicit fear to enable him to obtain the pocketbook. Thus, pursuant to this formulation as well, the sneakers may be determined to be a dangerous weapon.[3]

The defendant argues that, if the victim had not suffered from severe atherosclerosis (i.e., hardening of the arteries), her aorta would have returned to normal after the attack instead of collapsing and restricting the blood flow to her lower extremities and eventually causing her death. Thus, he argues, his use of the sneakers would not have resulted in serious bodily harm to a healthy individual.

The victim's physical condition *is* relevant to the determination whether the sneakers were used as a dangerous weapon, but not relevant in the manner suggested by the defendant. A dangerous weapon is one capable of doing serious damage to the victim of the assault. See *United States* v. *Bey*, 667 F.2d 7, 11 (5th Cir. 1982) (factors relevant to determination whether object is dangerous weapon include circumstances under which object is used and size and condition of assaulting and assaulted persons); *State* v. *Riddick*, 315 N.C. 749, 760 (1986), quoting *State* v. *Cawley*, 244 N.C. 701, 707 (1956) ("The deadly character of the weapon depends sometimes more upon the manner of its use and the condition of the person assaulted, than upon the intrinsic character of the weapon itself"). These criteria are consistent with the obvious public interest in deterring violence. Cf. *Commonwealth* v. *Perry*, 6 Mass. App. Ct. 531, 535 (1978) (evidence sufficient to warrant finding that toy gun was "dangerous weapon" within meaning of G. L. c. 265, § 18A [armed assault in dwelling with intent to commit felony]). Using sneakers to stomp on the stomach of an elderly woman is using them in a manner that renders them capable of inflicting serious injury. See *Commonwealth* v. *Fernandez, supra* at 315-316.

A victim's condition may include facts of which an assailant

---

[3]The judge instructed the jury appropriately as to the definition of a dangerous weapon: "A dangerous weapon is any instrument which, by the nature of its construction or the manner of its use, is capable of causing grievous bodily injury or death, or could be perceived by a reasonable person as capable of such injury. An item is a dangerous weapon if it is used in a way that it reasonably appears to be capable of causing serious injury or death to another person."

is unaware (such as the victim's atherosclerosis) because the question whether an object is used in a dangerous manner is an objective, not subjective, one. The defendant's state of mind is not relevant; rather it is his conduct that is at issue. Thus, the weapon used during the course of criminal conduct may be deemed dangerous on the basis of factors concerning the victim that are unknown to the defendant.[4] Thus, that the seriousness of the injury was aggravated due to the victim's atherosclerosis does not change our analysis. To the extent that the defendant argues that the victim would not have died but for her preexisting condition, our law has rejected this argument. In a criminal case "the wrongdoer takes the victim as he or she finds him." See *Commonwealth* v. *Starling*, 382 Mass. 423, 429 (1981) (instructions correct that preexisting condition did not negate defendant's liability). "The longstanding rule in this Commonwealth is that '[i]f a person inflicts a wound with a deadly weapon in such manner as to put life in jeopardy, and death follows as a consequence of this felonious and wicked act, it does not alter its nature or diminish its criminality to prove that other causes cooperated in producing the fatal result.' " *Commonwealth* v. *Fernette*, 398 Mass. 658, 668 (1986), quoting *Commonwealth* v. *Hackett*, 2 Allen 136, 142 (1861). This rule applies even if the jury find that the wounds of the victim were improperly treated and that such treatment contributed to the victim's death. *Commonwealth* v. *Fernette, supra.* See *Commonwealth* v. *Graham*, 431 Mass. 282, 290 (2000).

The defendant also claims that the use of the weapon must demonstrate an intent on the part of the perpetrator to employ the instrumentality as a weapon. Although the judge, in an abundance of caution, added this requirement to her instructions concerning a dangerous weapon, our cases have never imposed such a requirement. See *Commonwealth* v. *Appleby*, 380 Mass. 296, 308 (1980); *Commonwealth* v. *Connolly*, 49 Mass. App. Ct. 424, 425 (2000). This additional instruction to which the Commonwealth objected simply placed a further and unrequired burden on the Commonwealth.

2. The defendant next argues that, if we do conclude that the use of the sneakers in this situation may constitute an armed

---

[4]This follows logically from our general rule that the wrongdoer takes the victim as he or she finds him. The same reasoning underlying that rule should apply to determine whether a weapon is dangerous: the condition of the victim is determined without reference to the state of mind of the defendant.

robbery, then the circumstances of this case require an exception to the rule that an armed robbery is inherently dangerous. There is no reason to make such an exception. We have delineated several felonies, including armed robbery, as "inherently dangerous." See *Commonwealth* v. *Matchett*, 386 Mass. 492, 505 n.15 (1982). "These felonies, as a matter of law, may support a conviction of felony-murder. There is no need to show a 'conscious disregard for human life because the risk is implicit in the intent required for the felony.' " *Commonwealth* v. *Scott*, 428 Mass. 362, 364 (1998), quoting *Commonwealth* v. *Cook*, 419 Mass. 192, 206 (1994).[5] Here, once the jury determined that the use of the sneakers constituted a dangerous weapon (which they did by returning a verdict of guilty on the indictment charging armed robbery), the prerequisite of the *Matchett* definition has been established. The intent to commit the felony serves as the malice necessary for murder. *Commonwealth* v. *Matchett, supra* at 505-507.[6]

3. *Jury instructions.* a. The defendant claims that the judge erred by denying his motion for a required finding of not guilty on the charge of felony murder with armed robbery as the underlying felony because the act that was the basis of the dangerous weapon element of armed robbery, the use of a shod foot, is the same act that caused the victim's death. In essence, the defendant's contention is that the armed robbery was not sufficiently independent of the homicide to support a conviction

---

[5]"Because the felony of unarmed robbery is not inherently dangerous to human life, i.e., it can be committed without a foreseeable risk to human life, the Commonwealth must show that the defendant committed the felony with conscious disregard for human life before [the felony] may be used as a basis for a felony-murder conviction" (citations omitted). *Commonwealth* v. *Cook*, 419 Mass. 192, 205 (1994).

[6]We note that the judge properly instructed the jury that the Commonwealth must prove "beyond a reasonable doubt that the felony the defendant committed was inherently dangerous or the defendant in committing the felony acted with a conscious disregard to the risk of human life." Then she explained that "armed robbery as a matter of law is . . . a crime that is inherently dangerous to human life and therefore reflects a conscious disregard of risk to human life." She also instructed that "for the Commonwealth to prove the defendant guilty of first degree murder under the felony murder rule for unarmed robbery . . . [because] unarmed robbery is not necessarily an inherently dangerous crime to human life . . . you must consider whether under the circumstances of this case, the defendant exhibited a conscious disregard for risk to human life." Thus, even if the jury convicted the defendant of felony murder with unarmed robbery as the underlying felony, they did so after being properly instructed regarding the requisite conscious disregard to human life.

of felony-murder. It is the intent to steal or to take property that serves as the substitute for the malice requirement of murder and qualifies the crime of armed robbery for the application of the felony-murder rule. *Commonwealth* v. *Christian*, 430 Mass. 552, 556 (2000).

b. The defendant claims error in the judge's instructions concerning the felony-murder rule. She instructed the following:

> "By causing the victim's death, I mean that the Commonwealth must prove beyond a reasonable doubt that the defendant must have directly and substantially set in motion a continuous chain of events that produced the victim's death and without which the death would not have occurred. Death must occur as a direct result of the defendant's acts. A longstanding rule in this Commonwealth is that if a person inflicts injury with a deadly weapon in such a manner as to put life in jeopardy and death follows as a consequence of this act, then it does not alter its nature or diminish its criminality, that other cause [*sic*] may have cooperated in producing the fatal result. The other causes includes any medical treatment the victim may have received."[7]

The defendant did not object to this formulation. Thus, we review in order to determine whether, if there were any error, the judge's instruction created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Casey*, 428 Mass. 867, 868 (1999).

The defendant maintains that the judge erred in failing to instruct the jury that the death must be a natural and probable consequence of the defendant's actions. We have recently upheld the use of language similar to that used by the judge in this case. See *Commonwealth* v. *Pike*, 431 Mass. 212, 216 (2000) (the jury were properly instructed that, before they could convict of murder, they must conclude that 'the action of [the defendant] was the proximate cause of [the victim's] death . . . *a cause, which, in natural continuous sequence, produces a death, and*

---

[7]This language occurs in the judge's definition of an unlawful killing when she instructed the jury on murder in the first degree based on extreme atrocity or cruelty. When she reached the instruction on murder in the first degree based on felony-murder, she stated: "The definition of an unlawful killing is exactly the same as I've already described it to you in the first degree murder theory, committed with extreme atrocity or cruelty. Again, it's exactly the same and I'm not going to go over it anymore."

*without which the death would not have occurred.'* No more was necessary." [Emphasis supplied]). The language in the present case is virtually identical to that approved in *Commonwealth* v. *Pike, supra.* In addition, the judge here stated that "[d]eath must occur as a direct result of the defendant's acts." See *Commonwealth* v. *Wade,* 428 Mass. 147, 149-150 (1998), quoting *Commonwealth* v. *Matchett, supra* at 505 (although judge "did not instruct that '[t]he homicide must be a natural and probable consequence of the felonious act,' " he made clear that Commonwealth had to prove that the act that was the proximate cause of death was an act that "in the natural and continuing sequence of events produces death, and without which, death would not have occurred").

We note that the Commonwealth is incorrect when it suggests that "natural and probable consequence" is the equivalent of "proximate cause." While the defendant's felonious undertaking may be a proximate cause of the death, death may not necessarily be a probable consequence of the defendant's act. However, as we said in *Commonwealth* v. *Wade, supra* at 151, quoting *Commonwealth* v. *Chase,* 42 Mass. App. Ct. 749, 754 (1997): "Because the judge made clear 'the necessary causative relation between the defendant's act and the victim's death,' . . . there is no substantial likelihood of a miscarriage of justice created by the judge's failure to include the specific phrase 'natural and probable consequence.' "

4. *Allegation of ineffective assistance of counsel.* The defendant claims that he was deprived of the effective assistance of counsel because his trial counsel waived a motion to suppress challenging the eventual out-of-court identification of the defendant by Cecelia Peterson. The record confirms that trial counsel and the defendant considered this issue for a "few months" and that, after an explanation of the strategic ramifications, the defendant "expressed faith in [his trial counsel's] judgment" whether to waive the suppression motion. During the consideration of the issue of waiver of the motion to suppress the identification, the judge expressly noted the experience and "trial ability" of defense counsel. Nothing in the record indicates that the decision to waive the motion to suppress was made without great thought and consideration. The decision was also clearly based on the advice of counsel with considerable experience. The defendant cannot be relieved at this juncture of his part in this strategic decision. *Commonwealth* v. *Finstein,* 426 Mass. 200, 203-204 (1997) (when defendant and counsel

have discussed strategy, choice of how to proceed is attributable to defendant). The defendant must be free to decide how his case will be tried, even if he hurts his trial strategy. *Commonwealth* v. *Martin*, 425 Mass. 718, 720-721 (1997), and cases cited.

Assuming that the identification was suggestive and ignoring defendant's apparent acquiescence in the decision not to pursue the motion to suppress, the record does not support the proposition that waiving the motion to suppress constituted ineffective assistance. On the contrary, it appears that there was a sound tactical basis for the decision. The evidence against the defendant, even without Peterson's identification, was extremely strong. The defendant's fingerprint was found in the stolen car identified as the one used by the perpetrator. He had been in the general area just prior to the robbery and was described as anxious to obtain money to purchase more crack cocaine. He was in the area again shortly after the robbery and was in an unusually nervous state. Moreover, he admitted to committing the murder to an inmate in a house of correction. Finally, even if Peterson's eventual identification of the defendant had been suppressed, her initial description of him (which occurred long before any hint of police suggestiveness) would have been admissible; it very accurately described the defendant, at least as to height, weight, hair color, and facial hair. Similarly, the composites Peterson prepared were not the subject of suppression motions and examination of them reveals that they resembled the defendant.

A successful motion to suppress Peterson's identification would not seriously have weakened the Commonwealth's case. Permitting the identification testimony and then attacking the strength and circumstances of the identification provided the defense with a basis on which to attack the police procedure. The defendant argued that his arrest and prosecution were the result of a police rush to judgment in a highly publicized murder case in which the police were under pressure to make an arrest. Peterson's identification, and the police conduct that led to that identification, were used to illustrate that rush to judgment. The defendant could impeach Peterson's identification in an effort to develop enough question on that issue that might create a reasonable doubt about the entire case. Indeed, a large segment of the defendant's opening statement and closing argument were devoted to that precise point. In short, Peterson's identification was weak and provided the defense with an issue

to attack. The choice was made after consultation with the defendant and was a reasonable, tactical one, even if it did not ultimately succeed with the jury. *Commonwealth* v. *Scott*, 430 Mass. 351, 358 (1999). "Strategic choices reasonably made by counsel with a defendant's concurrence may not be challenged successfully on appeal on the ground that counsel was ineffective in a constitutional sense." *Commonwealth* v. *Finstein, supra* at 204. The theory on which a case is tried will not be ignored on appeal. *Commonwealth* v. *Rancourt*, 399 Mass. 269, 276 (1987), and cases cited.

5. *Spontaneous exclamation.* The defendant contends that the judge erred in admitting as a spontaneous exclamation the victim's statement to the doctor at the hospital made approximately one-half hour after the incident. The doctor testified that the victim's response to his inquiry about "what [had] happened" to cause her injuries was that the perpetrator had stomped "twice" on her abdomen. The defendant objected to this testimony. The defendant claims that the statement is excluded from the spontaneous exclamation exception to the hearsay rule because it was made too long after the exciting event and after the victim had already spoken to other people, including the police.

"A statement made under the impulse of excitement or shock is admissible if its utterance was spontaneous to a degree that reasonably negated premeditation or possible fabrication and if it tended to qualify, characterize, or explain the underlying event." P.J. Liacos, Massachusetts Evidence § 8.16, at 551 (7th ed. 1999); *Commonwealth* v. *Snell*, 428 Mass. 766, 777, cert. denied, 527 U.S. 1010 (1999). Although the time elapsed between the occurrence and the statement is important, the statement need not be strictly contemporaneous with the exciting cause to be admissible, provided that the underlying event has not lost its sway or been dissipated and the victim has not been influenced by contemplation or other factors. *Commonwealth* v. *DiMonte*, 427 Mass. 233, 239 (1998). *Commonwealth* v. *Grant*, 418 Mass. 76, 80-82 (1994) (statements of shooting victim admissible where due to circumstances of shooting and provision of medical treatment she had been nearly hysterical from time of shooting to her police interview one hour later). In *Commonwealth* v. *DiMonte, supra* at 240, we noted that the interval of time between the incident and the facsimile message (at least eight and one-half hours and perhaps as long as eleven hours after the presumed time of the

assault) sent by the victim was "at an outer limit" for qualifying the statement as a spontaneous exclamation.[8] We noted, see *id.*, cases from other jurisdictions that admitted statements as spontaneous exclamations made after relatively lengthy periods: *Guthrie* v. *United States*, 207 F.2d 19, 23 (D.C. Cir. 1953) (eleven hours after assault); *State* v. *Starcevich*, 139 Ariz. 378, 387-388 (Ct. App. 1983) (about nine hours after rape); *State* v. *Crowhurst*, 470 A.2d 1138, 1145 & n.4 (R.I. 1984) (about three hours after event). "[T]here can be no definite and fixed limit of time. Each case must depend upon its own circumstances." *Commonwealth* v. *DiMonte, supra* at 239, quoting *Commonwealth* v. *McLaughlin*, 364 Mass. 211, 223 (1973).

Here, the statement was made approximately one-half hour after the robbery while the victim remained in pain and emotional distress. She was an elderly woman who had suffered a vicious assault, her aorta had been crushed, and she was losing sensation in her legs. She was clearly terrified (she had not even wanted to give her name or address for fear of further harm).[9] The distress of the underlying event had not dissipated — if anything, it was deepening as fear about the seriousness of the injury increased — and there was no evidence that the victim had been influenced by other factors.

6. *Statements of inmate.* The defendant next claims that Michael Dubis was acting as an agent of the police when he obtained inculpatory statements from the defendant and that these statements should not have been admitted. Dubis, housed in the Plymouth County house of correction with the defendant, informed a State trooper that the defendant had admitted to the

---

[8]In the totality of the circumstances, the admission of the facsimile statement in *DiMonte* was found to be prejudicial error, however. *Commonwealth* v. *DiMonte*, 427 Mass. 233, 240 (1998).

[9]The victim's sister-in-law, who was not a percipient witness but was present when the victim made this statement to the doctor, testified that the victim said that the defendant stomped or punched her "real hard" in the stomach area. There was no objection to the hearsay aspect of this testimony. In addition, Peterson, the witness to the attack, testified that "seconds after the attack," when the victim was "visibly upset and . . . visibly in pain," the victim stated that "he had stomped on her stomach." The defendant concedes that this was properly admitted as a spontaneous exclamation, but notes that the doctor was the only person to testify that the victim said that the defendant stomped *twice* on her abdomen. The defendant suggests that the fact whether there was one stomp or two is important because the *degree* of force is critical. If so, the sister-in-law's testimony, admitted without objection to its hearsay aspect, established the degree of force.

murder. After providing this information to the police and requesting a transfer from the Plymouth County house of correction to the Duke's County house of correction at Martha's Vineyard, Dubis spoke with the defendant again. Dubis testified that in this second conversation the defendant stated that he wanted to marry his girl friend to prevent her from testifying at trial. The defendant claims that the admission of the statement made after Dubis originally spoke with the troopers violated his rights under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights, because Dubis was acting as an agent for the government. This issue was not raised when Dubis testified at trial. Accordingly, we consider it to determine whether the admission of the disputed evidence created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *James*, 424 Mass. 770, 787 n.26 (1997); *Commonwealth* v. *Grant*, *supra* at 84-85; *Commonwealth* v. *Dinkins*, 415 Mass. 715, 721-722 (1993), and cases cited.

Under the Sixth Amendment, the Commonwealth may not "deliberately elicit[]" statements from the defendant in the absence of his counsel, once formal adversary proceedings have begun. See *Massiah* v. *United States*, 377 U.S. 201, 206 (1964). Evidence deliberately elicited in violation of that proscription must be suppressed. See *Maine* v. *Moulton*, 474 U.S. 159, 172-176 (1985). This prohibition applies to informants acting as government agents as well as to police officers. *Commonwealth* v. *Reynolds*, 429 Mass. 388, 393 (1999). "An informant 'who has not entered into any agreement with the government, and who reports incriminating evidence to police out of conscience or even "an unencouraged hope to curry favor" is not acting as a government agent.' " *Id.*, quoting *Commonwealth* v. *Harmon*, 410 Mass. 425, 428 (1991). "If nothing is 'offered to or asked of' the informant, his actions will not be attributed to the Commonwealth." *Commonwealth* v. *Reynolds*, *supra*, citing *Commonwealth* v. *Rancourt*, 399 Mass. 269, 274 (1987).

When Dubis first met with a State trooper, he indicated a desire to be transferred from the Plymouth County house of correction to the facility on Martha's Vineyard. The trooper did not promise him anything, but merely said she "would take his information and . . . present it to the district attorney's office."

Although Dubis sought to obtain a change in housing arrangements in return for providing the information to the police, a person does not thereby become an agent of the government.

There was no evidence that anything was offered to or asked of Dubis, or even any evidence that the police sought any further information from him; the most that can be said is that the government indicated that his request for a transfer would be considered. Indeed, after the first conversation with Dubis in which he reported that the defendant had already confessed to the murder it would seem that no more was needed.[10] There was no promise of a benefit in exchange for Dubis's help. See *Commonwealth* v. *Rancourt, supra* at 272-274 (trooper's statement that he would arrange a meeting with the assistant district attorney did not amount to promise that established agency). Dubis eventually was transferred to the facility on Martha's Vineyard, but the evidence was that he was moved for safety reasons and that it is common practice to move inmates to prevent retaliation against those who provide information to the Commonwealth.[11] Finally, the sole information obtained by Dubis after he indicated that he wished to be moved was that the defendant wanted to marry his girl friend to prevent her from testifying against him. This evidence was only relevant to indicate possible consciousness of guilt and was of significantly less probative value than the evidence that the defendant had admitted to the murder. There was substantial other evidence of the defendant's consciousness of guilt: his anxious, fearful actions just after the murder; his lies to the police; and his admission to Dubis. There was no error. Even if there had been, the defendant's statement to Dubis about marrying his girl friend did not create a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Vinnie,* 428 Mass. 161, 177, cert. denied, 525 U.S. 1007 (1998).

7. *Relief pursuant to G. L. c. 278, § 33E.* We have considered the entire record pursuant to our obligation under G. L. c. 278, § 33E. There is no reason to exercise our authority to reduce the jury's murder verdict or to order a new trial. The defendant

---

[10]There is no claim that Dubis was acting as a government agent when the defendant initially admitted to Dubis that he had committed the murder.

[11]It is noteworthy that Dubis was not released from custody when he became parole eligible.

received a fair trial; the jury's murder verdict is consistent with the evidence; there was no ineffective assistance of counsel.[12]

*Judgments affirmed.*

---

[12]The defendant's contention that he may not be retried on any homicide charge without violating his constitutional right to be free from double jeopardy is obviously moot.