NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

21-P-303

COMMONWEALTH

vs.

LUIS RIVERA.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

A Superior Court jury convicted the defendant of three charges of aggravated rape of a child and one charge of indecent assault and battery on a person over fourteen.[1]  On appeal the defendant argues that the trial judge erred in admitting prior bad act evidence and multiple first complaint evidence and that various statements in the prosecutor's closing argument were improper.  We affirm.

Background.  The Commonwealth elicited the following evidence.  The victim lived with the defendant (her stepfather), her mother, and at various times her four siblings -- Dahlia,

---

[1] All of the offenses involved the same victim.  The three aggravated rape indictments alleged that the rapes occurred on divers dates between March 1, 2009, and March 1, 2015.  The fourth indictment alleged that the defendant committed an indecent assault and battery -- "putting his penis on top of [the victim's] vagina" -- on June 17, 2016.

Rosa, Julio, and Juanita.[2]  The victim shared a bedroom with Juanita.

The victim's earliest memory of being assaulted by the defendant was when she was in second or third grade and was at home with Juanita and the defendant.  The victim and Juanita went to sleep in the bedroom shared by their mother and the defendant.  During the night the defendant took the victim back to her bedroom, began to "hump" her through her clothes, removed her pants and underwear, and slid his penis against her vagina.

Another time, the defendant came into the victim's bedroom during the night holding a box cutter and gesturing to her not to say anything.  He proceeded to "hump" her through her clothes and then pulled down her pants and underwear and slid his hands against her vagina.  The victim testified that the defendant assaulted her in a similar manner on a weekly basis.  Juanita, who shared a bed with the victim, testified that she observed the defendant assault the victim about three times a week.

The defendant also assaulted the victim elsewhere in the home.  One night, while everyone else was asleep, he stopped the victim while she was passing through the living room to get to the kitchen.  The defendant put the victim on the ground, removed her pants and underwear, and rubbed his penis against

_____

[2] The siblings' names are pseudonyms.

her vagina.  Another assault occurred one day when the victim was getting ready for school, her mother was not home, and Juanita was still asleep.  The victim was leaving the bathroom wrapped in a towel, and the defendant stopped her and brought her to his room.  He proceeded to rub his penis against her vagina.

After assaulting the victim, the defendant would sometimes tell her to go to the bathroom to wash up and change her underwear.  The victim would find a "gooey" substance on her vagina or underwear that she later understood to be semen.  Once, the victim's mother heard the victim crying in the bathroom after an assault and asked her why she was crying.  The defendant, standing behind the mother, gestured at the victim not to say anything, and the victim stated that nothing happened.

Another night on which the defendant raped the victim, the victim's mother entered the victim's bedroom and saw her crying.  When the mother asked the defendant what happened, the defendant insisted that nothing happened and then grabbed a lamp and hit it against the victim's head, breaking the lamp.  Afterward, the victim and Juanita asked for a lock for their bedroom door.  Either the mother or the defendant drilled holes in the doorframe, and the victim and Juanita slid scissors and pencils into the holes to create a makeshift lock.

3

The last assault occurred when the victim was finishing eleventh grade in 2016. One morning the defendant knocked on the victim's locked bedroom door while she was sleeping and asked for help with his tablet. The victim told him that she could not help and tried to shut the door, but he held it open and entered the room. When the victim reached for her phone, the defendant took it away and told her to lie on the bed. He began "humping" her and directed her to remove her pants and underwear. He then slid his penis against her vagina. Afterward, he had the victim wash his semen off her underwear and vagina and said that "if [she] told anyone he would kill everyone in the house."

Soon after this assault, the victim told her mother and a friend that the defendant had been abusing her. The victim then went with some of her siblings to a police station, where she reported the abuse to a detective. The detective went to the family's home and recovered the victim's bedding, which tested negative for the presence of semen. As a result of the victim's report, the Department of Children and Families (DCF) sent her to live with her aunt.

Discussion. 1. Prior bad acts. At the defendant's first trial, which ended in a mistrial because of a deadlocked jury, the judge excluded certain bad act evidence. At trial in this case, the judge decided differently and admitted the evidence

4

over the defendant's objection.  The judge reasoned that the similarities of the bad acts to the charged assaults -- in time, location, relationship, victims' age, and manner in which the defendant gained access to the victims -- warranted their admission.

The first piece of evidence at issue was the victim's testimony about a sexual assault that occurred in Cambridge.[3] The victim testified that she and the defendant were going to a family cookout and the defendant offered to retrieve a tarp from a storage facility where he worked.  He insisted that the victim go with him.  Once inside the facility, the defendant told the victim to lie on the floor.  He removed the victim's pants and underwear, took out his penis, put a condom on, and rubbed his penis back and forth against her vagina.

The other evidence at issue concerned sexual abuse that the defendant committed against three of the victim's siblings, Dahlia, Julio, and Rosa.  Dahlia testified that in 2003, when she was sixteen years old, the defendant entered her bedroom while she was sleeping, climbed on top of her, and started touching her body.  When she struggled, the defendant hit her, retrieved a knife from the kitchen, and said he wanted to kill

_____

[3] This assault was not part of the charged conduct because it occurred in a different county.  The victim could not recall the year in which it occurred.

her.  Julio testified that he was watching television one morning in the living room when the defendant entered, got on top of him, and covered his mouth.  The defendant pulled Julio's pants down, tried to insert his penis into Julio's buttocks, and urinated or ejaculated in that area.  Inferentially, this occurred in or about 2003, when Julio was younger than ten years old.  Finally, Rosa testified that, after she moved to the United States in 2002, the defendant would often take her with him in his car to run errands and would then park, get on top of her, and make sexual movements.  The defendant would also enter Rosa's bedroom, get on top of her, take his penis out, and touch her breasts.  The defendant threatened to kill Rosa and her siblings or take away their residency papers if she told her mother.

The defendant argues that all of this evidence should have been excluded as prior bad act evidence.  Although prior bad acts are "inadmissible for the purpose of demonstrating the defendant's bad character or propensity to commit the crimes charged," they may be admitted to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or pattern of operation" (quotation omitted).  Commonwealth v. Crayton, 470 Mass. 228, 249 (2014).  Bad act evidence should be excluded, however, "if its probative value is outweighed by the risk of unfair prejudice to the defendant."  Id.  We review the judge's

decision to admit the evidence for abuse of discretion.  See Commonwealth v. Gonzalez, 469 Mass. 410, 421 (2014).

The judge was within her discretion to admit the evidence of the uncharged Cambridge assault.  That evidence was "relevant to show a pattern of conduct and the existence of the defendant's sexual interest in the victim."  Commonwealth v. Centeno, 87 Mass. App. Ct. 564, 567 (2015).  It also was not unfairly prejudicial where the jury heard evidence of the charged conduct, which involved numerous instances of the defendant assaulting the victim in a similar manner.  Moreover, the judge instructed the jury about the proper use and purpose of bad act evidence after the victim's testimony and again in the final charge.  See Commonwealth v. Peno, 485 Mass. 378, 395-396 (2020).

The judge was likewise within her discretion to admit the testimony of the victim's siblings.  After an extended discussion with counsel, the judge carefully explained the reasons for her decision, including that the victim and the siblings had a similar relationship with the defendant -- i.e., he was their stepfather and a trusted authority figure, who began abusing each of the children when they were of similar age.  The judge further reasoned that the assaults on the victim and the siblings were close in time and mostly occurred in the home, where the defendant had regular, unsupervised access to

the children.  And, as the judge found, the defendant "created situations where he was alone with [each] child, either by coming in in the middle of the night or separating [the child from] others."  Given the similarities in the circumstances of the assaults, the judge permissibly found that the siblings' testimony was admissible for a nonpropensity purpose.  See Commonwealth v. Robertson, 88 Mass. App. Ct. 52, 56 (2015) (bad act evidence admissible because it "tended to show the defendant's intent and inclination to commit the charged acts and it corroborated the pattern of conduct testified to by the victim").

Because the case turned on the victim's credibility, the judge also permissibly concluded that the probative value of the siblings' testimony outweighed any unfair prejudice to the defendant.  While the testimony was powerful, it did not overwhelm the trial, during which the jury heard extensive testimony about the charged conduct.  Cf. Commonwealth v. Dwyer, 448 Mass. 122, 128-129 (2006).  Moreover, at multiple points during the trial, the judge gave careful limiting instructions about the narrow purpose of bad act evidence, emphasizing that the jury could not consider the bad acts as proof that the defendant committed the charged conduct or as proof of his criminal personality or bad character.  The judge gave these instructions before each sibling testified and again in the

8

final charge. Considering the judge's detailed reasoning, and her repeated limiting instructions, we discern no abuse of discretion. See Commonwealth v. Facella, 478 Mass. 393, 408-409 (2017).

For the first time on appeal, the defendant claims that the victim's testimony about the defendant hitting her with a lamp should also have been excluded as bad act evidence. Contrary to the defendant's suggestion, this issue was not preserved at trial. Although defense counsel objected to a question asking the victim if the defendant was ever physically violent toward her, he gave no basis for the objection and so did not preserve the issue. See Commonwealth v. Moreno, 102 Mass. App. Ct. 321, 324 n.5 (2023). In any event, evidence about the defendant's violence toward the victim was admissible for the nonpropensity purpose of explaining why she did not report the sexual abuse earlier. See Commonwealth v. Hall, 66 Mass. App. Ct. 390, 394 (2006). And, in the context of the other evidence of the defendant's repeated sexual assaults, the prejudicial effect of this evidence was minimal. Thus, there was no substantial risk of a miscarriage of justice.[4]

---

[4] We reject the defendant's argument, to the extent made, that the judge erred by allowing the victim to testify that DCF placed her in foster care after she reported the rapes. While the defendant characterizes this testimony as bad act evidence, he fails to explain how the foster care placement was a bad act committed by him.

2.  First complaint.  The defendant challenges three pieces of evidence as violative of the first complaint doctrine: (1) the victim's testimony that she disclosed the abuse to her friend (the first complaint witness) by both telephone and text message; (2) the victim's testimony that she disclosed the abuse to her mother after disclosing to her friend; and (3) the testimony of Emily Rivera Nunez, a forensic interviewer, that the victim disclosed a prior, uncharged sexual assault when she was five years old.  The defendant did not object to the victim's testimony about her disclosures to her friend and mother, so we review to determine whether any error created a substantial risk of a miscarriage of justice.  See Commonwealth v. McCoy, 456 Mass. 838, 845-846 (2010).  The defendant objected to Nunez's testimony, so we review for prejudicial error.  See Commonwealth v. Aviles, 461 Mass. 60, 72-73 (2011).

The victim's testimony did not give rise to a substantial risk of a miscarriage of justice.  The victim testified that she first disclosed the abuse to her friend in June 2016; when asked how she communicated with the friend, the victim replied, "It was on, like, the phone.  Texting."  She then testified that she "told [her] mom" while her friend was "on the line."  We do not agree with the defendant's characterization of this testimony as establishing that the victim "originally told [the friend] via text and then discussed it with her again later on the

10

telephone."  The sequence of the disclosures, and the proximity in time between them, are unclear from the testimony, which again was unobjected to at trial.[5]  In any event, even assuming that the disclosures constituted separate complaints, the defendant has not shown that the testimony created a substantial risk of a miscarriage of justice where it was brief and devoid of any details about the sexual assaults.  See Commonwealth v. Roby, 462 Mass. 398, 409 (2012).  Likewise, the defendant has failed to demonstrate a substantial risk of a miscarriage of justice arising from the judge's failure to give a limiting instruction contemporaneously with the victim's testimony, see Commonwealth v. King, 445 Mass. 217, 248 (2005), where the judge gave the required instruction when the friend testified and in the final charge.

We further conclude that the judge was within her discretion in admitting Nunez's testimony.  Nunez testified that, when the victim was five years old, she disclosed during an interview that the defendant had touched her vagina over her

---

[5] The victim did not testify that she made sequential disclosures to the friend until defense counsel elicited testimony to that effect on cross-examination.  Specifically, the victim testified on cross-examination that she first sent a text message to her friend telling her "what happened," "told [her] mom" that night, and then called her friend.  This testimony contradicted the victim's earlier testimony that her friend was "on the line" when the victim called her mother, as well as the friend's testimony that she "was on the phone while [the victim] told her mother."

11

clothing twice in one evening.  If this disclosure constituted a first complaint, even though the incident was not charged conduct (an issue we do not decide), it was admissible under Commonwealth v. Kebreau, 454 Mass. 287 (2009).  There, the court held that the first complaint doctrine "permits testimony from two first complaint witnesses in circumstances . . . where each witness testifies to disclosures made years apart concerning different periods of time and escalating levels of abuse, which constitute different and more serious criminal acts committed over a lengthy period."  Id. at 288-289.  That is the case here -- Nunez and the victim's friend testified to disclosures of sexual abuses made almost twelve years apart and involving escalating levels of abuse.  If Nunez had not been permitted to testify, "the jury could have questioned [the victim's] credibility for enduring the abuse for years without any complaint."  Id. at 295.  This would defeat one of the purposes of the first complaint doctrine.  See Commonwealth v. Dale, 86 Mass. App. Ct. 187, 191 (2014) (earlier disclosure, which victim did not remember making, admissible because it advanced doctrine's purpose of "refut[ing] the stereotype that silence is evidence that the [victim] lacks credibility").

Furthermore, whether or not the disclosure to Nunez constituted a first complaint, the judge was within her discretion to admit it as a prior consistent statement of the

12

victim.  See Commonwealth v. Arana, 453 Mass. 214, 220-221 (2009) (first complaint doctrine does not "prohibit the admissibility of evidence that, while barred by that doctrine, is otherwise independently admissible").  While prior consistent statements are generally inadmissible, "an exception exists where a trial judge makes a preliminary finding (1) that the witness's in-court testimony is claimed to be the result of a recent fabrication or contrivance . . . and (2) that the prior consistent statement was made before the witness had a motive to fabricate."  Commonwealth v. Caruso, 476 Mass. 275, 284 (2017).  See also Mass. G. Evid. § 613(b).  The findings need not be explicit.  See Caruso, supra.  At sidebar before Nunez testified, the judge stated that "the entire thrust of the defense here . . . is fabrication" and that Nunez's testimony about the victim's disclosure "rebuts the accusation of fabrication, particularly given the fact that [the victim] did not remember mentioning any sexual assault until years after it had occurred."  The judge thus determined that Nunez's testimony was "relevant to the jury's determination of the weight that they should give the evidence in light of the defense of fabrication."  This was within the judge's discretion.  See id. at 285 ("trial judges have broad discretion to determine whether circumstances warrant the admission of prior consistent statements to rebut a claim of a recent fabrication").

13

3. Closing argument. The defendant challenges various portions of the prosecutor's closing argument as improper. Because the defendant objected to each of the statements, we review for prejudicial error. See Commonwealth v. Cole, 473 Mass. 317, 333 (2015).

The defendant first argues that the prosecutor improperly vouched for the credibility of the witnesses and expressed her own opinion about the evidence by repeatedly characterizing the witnesses and evidence as "credible." We are not persuaded. All of the challenged statements were based on the evidence and did not constitute vouching, as none "express[ed] a personal belief in the credibility of a witness, or indicate[d] that [the prosecutor] ha[d] knowledge independent of the evidence before the jury." Commonwealth v. Wilson, 427 Mass. 336, 352 (1998).

In a similar vein, the defendant argues that the prosecutor vouched for the victim's credibility by commenting on her testimony regarding the makeshift lock on the bedroom door and expressed her personal opinion about the lack of semen evidence found on the victim's bedding. Regarding the lock, the prosecutor stated, "This lock screams credibility. Who thinks of this? A child. Scissors, ladies and gentlemen, to keep somebody out of a room. No adult would come up with this." Regarding the lack of semen evidence, the prosecutor stated, "[S]ometimes, ladies and gentlemen, things drip. Things drip

14

off.  But you know from the evidence that nothing dripped this time.  The fact that nothing dripped onto the sheets in no way suggests to you that this didn't happen."  The defendant does not explain, nor do we see, how these statements expressed the prosecutor's personal belief in the victim's credibility or suggested that she had knowledge outside the evidence.  See Wilson, 427 Mass. at 352.  We conclude instead that the statements were permissible inferences from the evidence or, at worst, "[e]nthusiastic rhetoric."  Id. at 350, quoting Commonwealth v. Sanna, 424 Mass. 92, 107 (1997).

Finally, the defendant argues that the prosecutor appealed to the jury's sympathies and inflamed their passions by describing the demeanor of the victim and her sisters when they testified.  For example, the defendant challenges the prosecutor's statements that the victim "started to cry when she had to start talking about the time she was removed from her mother" and that the "fear of being removed by DCF was real, it was raw, and it's palpable."  He also challenges statements such as, "[t]hink about how [the sisters] testified, their demeanor as they broke down on the stand and told you the horrific things that this Defendant did to them when they were children."  We do not agree that these statements were improper.  "A prosecutor can address, in a closing argument, a witness's demeanor, motive for testifying, and believability, provided that such remarks

15

are based on the evidence, or fair inferences drawn from it, and are not based on the prosecutor's personal beliefs." Commonwealth v. Freeman, 430 Mass. 111, 118-119 (1999). The prosecutor's statements here did not stray from the evidence and permissibly "invited the jurors to draw a conclusion from their own observations of [the witnesses] as [they] testified." Commonwealth v. Pearce, 427 Mass. 642, 644 (1998). We conclude that they "were within the bounds of proper argument." Id.

Judgments affirmed.

By the Court (Green, C.J.,
  Shin & Hershfang, JJ.[6]),

*Joseph F. Stanton*

Clerk

Entered: July 17, 2023.

---

[6] The panelists are listed in order of seniority.

16